# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ORIGIS USA LLC and GUY VANDERHAEGEN | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. N23C-07-102 |
| | ) | SKR CCLD |
| GREAT AMERICAN INSURANCE COMPANY, NORTH AMERICAN SPECIALTY INSURANCE COMPANY, AXIS INSURANCE COMPANY, MARKEL AMERICAN INSURANCE COMPANY, BRIDGEWAY INSURANCE COMPANY, RSUI INSURANCE COMPANY, ASCOT SPECIALTY INSURANCE COMPANY, ENDURANCE ASSURANCE COMPANY, BERKSHIRE HATHAWAY SPECIALTY INSURANCE CORPORATION, IRONSHORE INDEMNITY, INC., and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

Submitted: March 13, 2024
Decided: May 9, 2024

*Upon Defendants' Motions to Dismiss,*
**GRANTED**

## <u>MEMORANDUM OPINION AND ORDER</u>

Brian M. Rostocki, Esquire, Anne M. Steadman, Esquire, REED SMITH LLP, Wilmington, Delaware, Carolyn H. Rosenberg, Esquire, REED SMITH LLP, Chicago, Illinois, Stephen T. Raptis, REED SMITH LLP, Washington, DC, *Attorneys for Plaintiffs Origis USA LLC and Guy Vanderhaegen*.

David J. Soldo, Esquire, MORRIS JAMES LLP, Wilmington, Delaware, Michael D. Margulies, Esquire, Charles W. Strotter, Esquire, CARLTON FIELDS, P.A., New York, New York, *Attorneys for Defendant Endurance Assurance Corporation*.

Jennifer C. Jauffret, Esquire, Puja A. Upadhyay, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, Courtney E. Scott, Esquire, TRESSLER LLP, New York, New York, *Attorneys for Defendant RSUI Indemnity Company*.

Robert J. Katzenstein, Esquire, Julie M. O'Dell, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Kevin M. Mattessich, Esquire, Kevin Windels, Esquire, KAUFMAN DOLOWICH VOLUCK, New York, New York, *Attorneys for Defendants Ascot Specialty Insurance Company and Ironshore Indemnity, Inc*.

Bruce E. Jameson, Esquire, John G. Day, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware, James T. Sandnes, Esquire, SKARZYNSKI MARICK & BLACK LLP, New York, New York, *Attorneys for Defendant Berkshire Hathaway Specialty Insurance Company*.

Krista M. Reale, MARGOLIS EDELSTEIN, Wilmington Delaware, Michael F. Perlis, Esquire, KAUFMAN BORGEEST & RYAN LLP, Woodland Hills, California, Patrick Stoltz, Esquire, KAUFMAN BORGEEST & RYAN LLP, Valhalla, New York, *Attorneys for Defendant Markel American Insurance Company*.

Shaun Michael Kelly, Esquire, Jarrett W. Horowitz, Esquire, Sara A. Barry, Esquire, CONNOLLY GALLAGHER LLP, Wilmington, Delaware, James K. Thurston, Esquire, WILSON ELSER, Chicago, Illinois, Daniel E. Tranen, Esquire, WILSON ELSER, St. Louis, Missouri, Erik J. Tomberg, Esquire, WILSON ELSNER, Raleigh, North Carolina, *Attorneys for Great American Insurance Company*.

Thaddeus J. Weaver, Esquire, DILWORTH PAXSON LLP, Wilmington, Delaware, Michael J. Smith, Esquire, Bryan W. Petrilla, Esquire, STEWART SMITH, West Conshohocken, Pennsylvania, *Attorneys for Defendant Bridgeway Insurance Company*.

Aaron M. Nelson, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware, *Attorneys for Defendant National Union Fire Insurance Company of Pittsburgh, PA*.

**RENNIE, J.**

# I. INTRODUCTION

This litigation is Plaintiffs' attempt to secure insurance coverage for an action currently pending in federal court (the "Underlying Litigation"). Plaintiffs look to two towers of D&O insurance to provide that coverage, naming a dozen individual insurers in the process. Plaintiffs' Complaint was met by a wave of opposition. Specifically, the Defendant Insurers filed six separate motions to dismiss, along with several substantive notices of joinder, which collectively raised a veritable host of issues. Plaintiffs responded to that onslaught with a single, consolidated answering brief—although, "filing" may be a more apt term for that document.

Against that muddied backdrop, two key issues emerged as determinative and will, therefore, be the focus of this opinion. Together, those two issues instruct the Court to grant the motions to dismiss.

First, a provision in the earlier tower of insurance, dubbed the "No Action" clause, commands that no actions may be filed against the insurer until the insured's payment obligations are finally determined. Plaintiffs neither contest that reading nor dispute that their payment obligations remain unsettled. Plaintiffs instead seek to convince the Court that the need to enable swift litigation against insurers outweighs the need to enforce contracts as written. That attempt falls short. In this singularly contractarian jurisdiction, the Court construes the parties' intent based on

1

the language of the policy, not extrinsic sources that purport to shed light on what similar provisions are supposed to mean.

The second pivotal issue pertains to the prior acts exclusions found in the latter tower's policies. As explained more fully below, the Underlying Litigation centers on alleged wrongs that occurred too early to be eligible for coverage under the latter tower. To escape that fact, Plaintiffs point to three paragraphs of the Underlying Litigation's operative complaint (the "Underlying Complaint") that mention wrongful conduct that occurred after the exclusion's cut-off date. As a primary matter, the Court is unconvinced that those ancillary allegations qualify as a "Claim" for which coverage is available. In any event, the Court is satisfied that to the extent those allegations are a Claim, they arose out of earlier alleged misconduct and so are excluded by the prior notice exclusions.

At bottom, Plaintiffs' policies do not support Plaintiffs' current suit. In one set of policies, Plaintiffs agreed not to sue their insurers until the occurrence of a particular event that is yet to occur. In the other set of policies, Plaintiffs waived coverage for pre-existing wrongs such as the Underlying Litigation. Accordingly, the motions to dismiss must be **GRANTED**.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  The Parties

Plaintiff Origis USA LLC ("Origis") is a Delaware entity with its headquarters in Florida.[2] Plaintiff Guy Vanderhaegen is a Florida resident and the Chief Executive Officer of Origis.[3]  Plaintiffs are named as defendants in the Underlying Action, which is currently pending in New York federal court.[4]

Defendant Great American Insurance Company ("Great American") is an Ohio entity that insured Plaintiffs.[5]

Defendant North American Specialty Insurance Company ("North American") is a Missouri entity that insured Plaintiffs.[6]

Defendant AXIS Insurance Company ("Axis") is an Illinois entity that insured Plaintiffs.[7]

---

[1]  The following facts are based upon the well-pled allegations in the Complaint, as well as the documents attached thereto.  These allegations are accepted as true solely for purposes of this decision.

[2]  Compl. ¶ 7 (D.I. 1).

[3]  *Id.* ¶ 8.

[4]  *Id.* ¶ 1.

[5]  *Id.* ¶ 9.

[6]  *Id.* ¶ 10.

[7]  *Id.* ¶ 11.

Defendant Markel American Insurance Company ("Markel") is a Virginia entity that insured Plaintiffs.[8]

Defendant Bridgeway Insurance Company ("Bridgeway") is a Delaware entity that insured Plaintiffs.[9]

Defendant RSUI Indemnity Company ("RSUI") is a New Hampshire entity that insured Plaintiffs.[10]

Defendant Ascot Specialty Insurance Company ("Ascot") is a Rhode Island entity that insured Plaintiffs.[11]

Defendant Endurance Assurance Corporation ("Endurance") is a Delaware entity that insured Plaintiffs.[12]

Defendant Berkshire Hathaway Specialty Insurance Corporation[13] ("Berkshire Hathaway") is a Nebraska entity that insured Plaintiffs.[14]

---

[8] *Id.* ¶ 12.

[9] *Id.* ¶ 13.

[10] *Id.* ¶ 14.

[11] *Id.* ¶ 15.

[12] *Id.* ¶ 16.

[13] The Complaint lists the "Berkshire Hathaway Specialty Insurance *Corporation*," but that entity's filings suggest its proper name is "Berkshire Hathaway Specialty Insurance *Company*." The Court relies on the Complaint for present purposes and means no disrespect.

[14] *Id.* ¶ 17.

Defendant Ironshore Indemnity, Inc. ("Ironshore") is an Illinois entity that insured Plaintiffs.[15]

Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is a Pennsylvania entity that insured Plaintiffs.[16]

## B. The Underlying Litigation

The details of the Underlying Litigation are only tangentially relevant to this coverage dispute. It was brought by Pentacon BV and Baltisse NV (together, the "Investors") to recover sums that Plaintiffs and Plaintiffs' affiliates—who are not insured under the two towers at issue here—allegedly stole through fraud.[17] The heart of the allegations is that Plaintiffs and their affiliates undersold the Investors on the value of the Investors' shares in Origis and Origis's parent company, Origis Energy NV.[18]

The alleged scheme began in early 2019, when Plaintiffs supposedly diminished the Investors' oversight of Origis.[19] Then, in two transactions in October 2020 and January 2021, Plaintiffs and their affiliates bought out the Investors' interest in Origis and Origis Energy for $105 million.[20] Just a few months later,

---

[15] *Id.* ¶ 18.

[16] *Id.* ¶ 19.

[17] Compl., Ex. N (hereinafter "Underlying Litig. Am. Comp.") ¶¶ 1-2.

[18] *Id.* ¶¶ 2-5.

[19] *Id.* ¶ 14.

[20] *Id.* ¶ 23.

Plaintiffs sold Origis to a third party for $1.4 billion.[21] The investors complain that they did not get their fair share of that payday.[22]

## C. The 2021-22 Tower

The first relevant tower of D&O polices that Origis bought and that cover Vanderhaegen (the "2021-22 Tower") had a policy period of June 10, 2021 to June 10, 2022, with an extended reporting period until November 18, 2027.[23] In this tower, Great American issued the primary policy and North American, Axis, and Markel (together, the "2021-22 Insurers") issued follow-form excess policies in that ascending order.[24] After the applicable retention, each of the 2021-22 Insurers had a $5 million limit.[25]

As relevant here, Great American's policy, which was followed by the other 2021-22 Insurers' policies, states:

> With respect to any **Liability Coverage Part**, no action shall be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all the terms of this Policy, and until the **Insured's** obligation to pay has been finally determined by an adjudication against the **Insured** or by written agreement of the **Insured**, claimant and the **Insurer**.[26]

---

[21] *Id.* ¶ 31.

[22] *Id.* ¶ 32.

[23] Compl. ¶ 24.

[24] *Id.* ¶¶ 25-26.

[25] *Id.*

[26] Compl., Ex. A at General Terms and Conditions § XI.A.

**D. The 2023-24 Tower**

The second relevant tower of D&O insurance (the "2023-24 Tower") had a policy period of February 4, 2023 to February 4, 2024.[27] In this timeframe, Bridgeway issued the primary policy, and RSUI, Ascot, Endurance, Berkshire Hathaway, Ironshore, Markel, and National Union (together, the "2023-24 Excess Insurers" and, together with Bridgeway, the "2023-24 Insurers") each issued excess policies in that ascending order.[28] After the applicable retention, each of the 2023-24 Insurers had a $2.5 million limit.[29]

Each of the 2023-24 Tower's policies had a provision excluding coverage for claims arising out of wrongful acts that first occurred before November 18, 2021.[30] There are slight differences in the way each Insurer chose to word this exclusion, but the substance of the exclusions have uniform application in this instance.[31] Most importantly, each exclusion incorporates the notion of excluding claims that arise out of a wrongful act that first occurred before November 18, 2021.[32] RSUI's first-layer excess policy reflects a fairly representative example, stating:

---

[27] Compl. ¶ 28.

[28] *Id.* ¶¶ 29-30

[29] *Id.*

[30] *See* 2023-24 Excess Insurers' Joint Mot. to Dismiss (hereinafter "2023-24 Excess Mot."), Ex. A (D.I. 97). This exhibit collates the various prior acts exclusions from the 2023-24 Excess Insurers' policies into a single document. The Court appreciates this convenience.

[31] *Id.*

[32] *Id.*; *see also* Compl., Ex. E at p.64 (Bridgeway's prior acts exclusion endorsement).

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to <u>November 18, 2021</u>.[33]

## E.  Procedural History

Plaintiffs initiated this action with their Complaint on July 13, 2023.[34]  On October 4, 2023, Plaintiff was met with separate motions to dismiss from Axis,[35] Great American,[36] Markel,[37] Bridgeway,[38] and jointly from the 2023-24 Excess Insurers.[39]  That same day, Markel joined in Great American and Axis's motions,[40] and National Union joined in the 2023-24 Excess Insurers' motion.[41]  On October 25, 2023, North American concluded the opening round with one more motion to dismiss.[42]

---

[33]  Compl., Ex. F at p.7.

[34]  Compl.

[35]  Axis's Mot. to Dismiss (D.I. 91).

[36]  Great American's Mot. to Dismiss (hereinafter "Great Am.'s Mot.") (D.I. 93).

[37]  Markel's Mot. to Dismiss (D.I. 95).

[38]  Bridgeway's Mot. to Dismiss (D.I. 99).

[39]  2023-24 Excess Mot.

[40]  Markel's Notice of Joinder (D.I. 94).

[41]  National Union's Notice of Joinder (D.I. 98).

[42]  North American's Mot. to Dismiss (D.I. 117).

Plaintiffs responded to that array of arguments in a consolidated answering brief on December 14, 2023.[43] After receiving Plaintiffs' opposition, Axis chose to withdraw its motion and answer the complaint—so Axis is not part of this decision.[44] On January 25, 2024, North American filed its reply brief.[45] The next day, Great American,[46] the 2023-24 Excess Insurers,[47] Markel,[48] and Bridgeway[49] each filed their reply brief. As before, National Union joined in the 2023-24 Excess Insurers' reply,[50] and Markel joined in Great American's reply.[51]

Following that fulsome briefing, the Court heard argument on March 13, 2024. At oral argument, Plaintiffs acknowledged that North American had an enforceable arbitration clause that North American chose not to waive.[52]

---

[43] Pls.' Opp'n Br. (D.I. 120).

[44] Stipulation and Order to Withdraw and Set Answer Deadline (D.I. 126).

[45] North American's Reply (D.I. 127).

[46] Great American's Reply (D.I. 128).

[47] 2023-24 Excess's Reply (D.I. 129).

[48] Markel's Reply (D.I. 132).

[49] Bridgeway's Reply (D.I. 134).

[50] National Union's Notice of Joinder (D.I. 130).

[51] Markel's Notice of Joinder (D.I. 131). Unlike the opening briefs, Markel also submitted a notice of joinder for the 2023-24 Excess Insurers' reply. Markel's Notice of Joinder (D.I. 133). That is despite the fact that Markel was already expressly joined in the 2023-24 Excess Insurers' reply. *See* 2023-34 Excess's Reply at 22. Markel then used this extraneous "notice of joinder" to launch a ripeness argument found nowhere in Markel or the 2023-24 Excess Insurers' opening briefs, nor the 2023-24 Insurers' reply brief. Markel cites no authority that permits such a filing.

[52] *See* March 13, 2024 Oral Argument Tr. at 77:4-14 (D.I. 156).

9

Accordingly, the claims against North American were dismissed without prejudice on March 14, 2024.[53]

## III. STANDARD OF REVIEW

When reviewing a motion to dismiss under Rule 12(b)(6), the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[54] The Court will not, however, accept "conclusory allegations that lack specific supporting factual allegations."[55]

## IV. DISCUSSION

Delaware courts review insurance contracts to assess the parties' intent "as expressed through their contractual language."[56] Like any contract, when an insurance contract's terms are reasonably susceptible of but one meaning, and are thus unambiguous, Delaware courts will apply that meaning.[57]

---

[53] Order Granting North American's Motion to Dismiss (D.I. 151).

[54] *See ET Aggregator, LLC v. PFJE AssetCo Hldgs. LLC*, 2023 WL 8535181, at *6 (Del. Super. Ct. Dec. 8, 2023).

[55] *Id.* at *6 (quoting *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[56] *Alexion Pharms., Inc. v. Endurance Assurance Corp.*, 2024 WL 639388, at *7 (Del. Super. Ct. Feb. 15, 2024) (quoting *Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130631, at *10 (Del. Super. Ct. Sept. 10, 2021)).

[57] *Id.* (citations omitted).

As general principles, coverage under an insurance contract is given a broad construction "to align with the insured's reasonable expectations," while exclusions are read narrowly.[58] The insured bears the initial burden to demonstrate that coverage exists.[59] If the insured carries its burden, the burden shifts to the insurer to show an exclusion applies.[60]

## A. The No Action Clause Precludes This Litigation Against the 2021-22 Tower.

Great American, joined by Markel, argues that the plain language of the No Action clause blocks Plaintiffs' ability to bring this coverage dispute before the Underlying Litigation concludes.[61] Plaintiffs do not disagree that the No Action clause's plain language calls for that result. Instead, Plaintiffs cite wide-ranging precedent to demonstrate a supposed national disfavor for enforcing No Action clauses against an aggrieved insured.[62] Even accepting that premise, Delaware courts are exceptionally inclined to hold sophisticated parties to their bargains. For that reason, the Court will not disregard the No Action clause.

"The courts of this State hold freedom of contract in high—some might say, reverential—regard. Only 'a strong showing that dishonoring [a] contract is required

---

[58] *Id.* (quoting *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905-06 (Del. 2021)).

[59] *Id.*

[60] *Id.*

[61] Great Am.'s Mot. at 10-12.

[62] Pls.' Opp'n at 27-32.

11

to vindicate a public policy even stronger than freedom of contract' will induce our courts to ignore unambiguous contractual undertakings."[63]  Thus, in Delaware, "[p]arties have a right to enter into good and bad contracts, the law enforces both."[64] The Court's reluctance to relieve a party of its voluntary arrangements is especially strong when a sophisticated party, like the ones here, asks for such relief.[65]

Against that backdrop, Plaintiffs argument about the "draconian nature" of the No Action clause is unpersuasive.  Plaintiffs freely assented to this provision.  If they thought the potential delay in coverage it risked was unacceptable, they should not have accepted it.  The Court is fully confident that the representatives of this billion-dollar company were well-equipped to understand the policy language and negotiate necessary changes.  Not having done so, Plaintiffs cannot use this litigation to reopen negotiations.[66]

---

[63]  *Cantor Fitzgerald, L.P. v. Ainslie*, 2024 WL 315193, at *1 (Del. Jan. 29, 2024) (alteration in original) (quoting *ev3 v. Lesh*, 103 A,3d 179, 181 n.3 (Del. 2014)).

[64]  *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[65]  *See One Cypress Terminals, LLC v. Bluewing Midstream LLC*, 2023 WL 2401693, at *6 n.6 (Del. Ch. Mar. 8, 2023) ("Such provisions are enforceable, particularly where, as here, they are the result of negotiations by sophisticated parties." (citing *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382m at *10-11 (Del. Ch. July 9, 2002))); *see also Acme Mkts., Inc. v. Oekos Kirkwood, LLC*, 2023 WL 4873317, at *7 (Del. Ch. July 31, 2023) ("[U]nder Delaware law, sophisticated parties are bound by the terms of their agreement.  Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written." (quoting *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021))).

[66]  *Nemec*, 991 A.2d at 1126 (Delaware courts interpreting a contract "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal" (citing *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del. Ch. 2000))).

The Court also notes that Plaintiffs position is uncompelling with respect to the necessary "strong showing that dishonoring [a] contract is required to vindicate a public policy even stronger than freedom of contract."[67] The No Action clause does not permanently deprive Plaintiffs of any right. Instead, Plaintiffs ability to seek a remedy is simply deferred until there is certainty as to the Plaintiffs' losses. The Court's ruling is not intended to belittle the hardship that delayed relief might impose; but when compared to the economic and societal importance of stable contractual relationships free from outside interference, the latter concern takes priority.[68]

In support of their position that the No Action clause is unenforceable as written, Plaintiffs rely heavily on *Wright Construction Co. v. St. Lawrence Fluorspar, Inc.*[69] This is Plaintiffs only Delaware case discussing a No Action clause. In it, this Court concluded "a 'no action' clause in a liability policy will not prevent a defendant insured from impleading his insurer as a third-party defendant, even

---

[67] *Ainslie*, 2024 WL 315193, at *1 (quoting *ev3, Inc.*, 103 A.3d at 181 n.3).

[68] *See RSUI Indem. Co.*, 248 A.3d at 903 ("[P]ublic policy interests [sufficient to override a contract] are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligation." (quoting *ev3, Inc.*, 103 A.3d at 181 n.2)).

[69] 254 A.2d 252 (Del. Super. Ct. 1969).

though no judgment has been taken against the insured."[70]  Despite that language, the Court does not find *Wright* to be very persuasive.

First, it must be noted that in the half-century since *Wright* was decided, no Delaware court has cited to it.  Also, *Wright*'s value as an analogous precedent is lessened by the fact that the opinion does not set forth the particular language of the at-issue clause, only concluding it was "a standard 'no action' clause."[71]  Nor did the court explain the above-quoted conclusion except to say that it was based upon "[a] consideration of the authorities."[72]  *Wright*'s cursory analysis of the No Action clause—whatever its terms might have been—may be due to the fact that there was no available coverage, so the insurer was dismissed anyway.[73]  All told, *Wright*'s unexplained conclusion about a nondescript No Action clause in a different procedural posture is not enough to sway the Court to ignore the No Action clause for which the 2021-22 Insurers bargained.

More recently, this Court enforced a nearly verbatim No Action clause in *Rodriguez v. Great American Insurance Company*.[74]  The Court does not rely heavily on that decision either, though, because a different portion of the provision was at

---

[70]  *Id.* at 253-54.

[71]  *Id.* at 253.

[72]  *Id.*

[73]  *Id.* at 254.

[74]  2022 WL 591762 (Del. Super. Ct. Feb. 23, 2021).

14

issue. Specifically, instead of applying the "final determination" prong that is raised here, *Rodriguez* looked at the alternative "full compliance with all terms of this Policy" condition.[75] The Court recognizes that the two distinct conditions in the No Action clause raise different concerns, so the application of one does not command application of the other. Nevertheless, *Rodriguez* at least indicates that there is no inherent presumption in Delaware law that an insured is at all times guaranteed the right to sue its insurer.

Finally, to the extent Plaintiffs mean to use extra-contractual sources to demonstrate what the parties intended at the time of contracting, Plaintiffs have not satisfied the prerequisite to make such an argument. Under Delaware law, extrinsic evidence has no role in the interpretation of an unambiguous contract.[76] In other words, if there is only one reasonable interpretation of a contract based on its plain language, "[e]xtrinsic evidence cannot itself create ambiguity."[77] Since the plain language of the No Action clause can only be reasonably read as a bar on actions against the 2021-22 Insurers until there is a final determination of Plaintiffs' liability and full compliance with the relevant policy, Plaintiffs outside sources cannot dictate a different result.

---

[75] *Id.* at *9.

[76] *Deluxe Ent. Servs. Inc. v. DLX Acquisition Corp.*, 2021 WL 1169905, at *3 (Del. Ch. Mar. 29, 2021) (citations omitted).

[77] *Id.*

For those reasons, the Court will enforce the No Action clause as it is written. Hence, Plaintiffs' present claims against the 2021-22 Insurers are contractually prohibited. That prohibition will be lifted when Plaintiffs satisfy the two conditions contained in the No Action clause. Until then, the 2021-2022 Insurers' motions to dismiss must be granted.[78]

## B. The Prior Acts Exclusion Precludes Coverage under the 2023-24 Tower.

The analysis is even clearer with respect to the unavailability of coverage for the Underlying Litigation under the 2023-24 Tower. First, Plaintiffs have not established that the specific allegations they rely upon comprise a "Claim" as defined in the Bridgeway policy. And even if those allegations were a Claim, they unmistakably arise out of the more central conduct at issue in the Underlying Litigation, so coverage would be excluded under the prior acts exclusions.

Since the 2023-24 Tower only covers Claims for wrongful acts that occurred after November 18, 2021, Plaintiffs scoured the Underlying Complaint to find such wrongful acts. Out of 252 paragraphs, Plaintiffs found three to rely on.[79] Those three paragraphs allege:

> 158. In conjunction with the Indemnity Notice, Plaintiffs demanded access to the information from Origis necessary to carry out a complete

---

[78] As noted in the Procedural History, North American has already been dismissed, and Axis withdrew its motion to dismiss and answered the Complaint. *See supra* notes 44, 53. Thus, this decision only affects Great American and Markel.

[79] *See* Pls.' Opp'n at 76-77.

investigation of their claims. Plaintiffs had the right to this information pursuant to Section 8.4 of the SRA.

159. Defendants produced only a small portion of the information Plaintiffs requested. Rather than a complete production, Defendants proposed a list of search terms, to which Plaintiffs proposed revisions. But then Defendants refused to produce all documents responsive to their own proposed search terms. Defendants instead produced the Antin transaction documents as well as an overwhelming amount of irrelevant technical information from the Antin data room. Beyond that, Defendants produced only certain documents expressly relating to discussions with investment bankers and the financing of the buyout and largely did so from the email account of a single custodian— Vanderhaegen. Defendants also failed to provide access to Origis employees for interviews as provided for in the SRA.

160. The failure to provide all information necessary for Plaintiffs to investigate their claims breached Plaintiffs' information access rights in the SRA. But for these breaches, Plaintiffs would be able to set forth their claims with even more particularity.[80]

In Plaintiffs' view, because Paragraph 160 states that the allegedly insufficient production of information "breached [the underlying] Plaintiffs' informational access rights," those allegations are a Claim that stand apart from the other 249 paragraphs of the Underlying Complaint. Not so.

The Bridgeway policy's relevant definition of Claim, to which the other 2023-24 policies followed form, provides:

**Claim** means any:

> 1. Written demand first received by an **Insured** for monetary, non-monetary, declaratory or injunctive relief; [or]

---

[80] Underlying Litig. Am. Comp. ¶¶ 158-60.

2. Civil proceeding commenced by the service of a complaint or similar pleading;

. . . .

against an **Insured** for a **Wrongful Act**[.][81]

"Wrongful Act" is defined as, "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted[.][82]

The allegation that Plaintiffs breached an agreement with the Investors by failing to provide information might be a Wrongful Act, but no Claim followed. The Underlying Litigation does not seek any relief for that purported breach. In context with the rest of the Underlying Complaint, Paragraphs 158 through 160 reflect that the Investors merely wished to explain that there could be additional information that would support their action. For the same reason, the Underlying Litigation was not a civil proceeding against Plaintiffs "for" the allegations in Paragraphs 158 to 160.[83] Instead, those allegations are little more than an aside in a lengthy complaint that brings plenty of proper Claims—but only Claims for pre-November 2021 Wrongful Acts.

Even if the Court were to accept that Plaintiffs met their burden to establish coverage, the 2023-24 Insurers successfully refute that coverage with the prior acts

---

[81] Compl., Ex. E at D&O Liability Coverage § VI.A.

[82] *Id.* § VI.N.

[83] *Id.* § VI.A.2.

exclusion. As explained above, each of the applicable prior acts exclusions bar coverage for Claims that "arise out of" a Wrongful Act that first occurred before November 2021.[84] Thus, the question becomes whether the failure to comply with the Investors investigation "arose from" the conduct that necessitated the investigation. It did.

Relatedness inquiries almost invariably assess whether one litigation is related to another litigation.[85] That is sometimes a complex task requiring the careful weighing of several factors.[86] The task is less complicated when comparing one allegation in a complaint to another allegation in the same complaint. It is even simpler where, as here, the first allegation is an excluded wrongful act and the second allegation is the cover-up of that wrongful act. Indeed, it is difficult to conceive a much better fit for the term "arising out of" than the way a cover-up is predicated on an initial wrong. Accordingly, even if Paragraphs 158 to 160 of the Underlying Complaint constituted a Claim, that Claim would be precluded by the 2023-24 Tower's prior acts exclusions. For that reason, the 2023-24 Insurers' motions to dismiss must be granted.

---

[84] *See* 2023-24 Excess Mot., Ex. A.

[85] *See, e.g.*, *Alexion Pharms.*, 2024 WL 639388, at *8-10.

[86] *See First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 274 A.3d 1006, 1014-17 (Del. 2022).

## V. CONCLUSION

The No Action clause contained in the 2021-22 Policy precludes litigation against those insurers until Plaintiffs' payment obligation is finally determined.  The Prior Acts Exclusions contained in the 2023-24 Policies preclude coverage for the Underlying Litigation.  Therefore, Defendants' Motions to Dismiss are **GRANTED.**

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

20